Nos. 560 and 722

First Circuit

———

STANLEY v. LUTCHER-MOORE LUMBER
CO.

———

(March 5, 1930. Opinion and Decree.)
(April 14, 1930. Rehearing Granted.)
(January 26, 1931. Opinion and Decree on
Rehearing.)

———

Griffin T. Hawkins, of Lake Charles, attorney for plaintiff, appellee.

Pujo, Bell & Hardin, of Lake Charles, attorneys for defendant, appellant.

ELLIOTT, J. Daniel Stanley, an employee of Lutcher-Moore Lumber Company, alleges that he was a member of the team gang, and, while assisting in loading logs in the woods for transportation to its sawmill, and in the act of rolling a log with a cant hook for the purpose of loading it,

the hook tore loose, letting it roll back against his leg, bending his leg sideways at the knee, badly spraining the knee joint, tearing the ligaments and muscles in same, and pushing the kneecap up; that the accident occurred on July 14, 1928; that said injury has rendered him a permanent total disability, unable to perform labor or work of any reasonable character. He sues for compensation under the Workmen's Liability Act, claiming 65 per cent of his weekly wage of $13.50, for a period of 300 weeks, and $250 for doctor's services, medicine, and X-ray photographs.

Defendant denies that plaintiff received an injury, as alleged, and urges that, if plaintiff suffers any disability, it is not due to any accident or injury occurring while performing services arising out of and incidental to his employment by defendant; that at the date of the alleged injury plaintiff was suffering from chronic rheumatism, which condition was in no wise affected by any occurrence for which defendant is responsible.

The plaintiff recovered a compensatory judgment in the lower court for $8.78 per week, for a period of 175 weeks, and $15 for medical services, expenses, and doctor bills; the judge giving written reasons for his judgment.

Defendant has appealed.

Plaintiff, testifying as a witness in his own behalf, stated that he was hurt while rolling a log on the ground with a cant hook for the purpose of loading it on a wagon; that the log was crooked and the hook tore out, letting it roll back and strike him on the leg, hurting his knee; that it occurred on Saturday evening between 4 and 5 o'clock just at quitting time; that the log which hurt him was the last one loaded out that evening. But in another place he stated that the log which hit him was next to the last one to be loaded, that he had to handle; and in response to further questions said:

"If I don't make any mistake thereabouts Mr. Nelson helped me with the last log."

Pressed closer, he answered: "I do not remember whether I handled any other one, to be sure, or not"; that Mr. Nelson was present, saw it, heard him groan, came to him, and asked him how bad he was hurt.

Further questioned:

"Q. Tell how that log, if it was only 12 or 16 inches in diameter, could hit your knee?
"A. It hit my leg (showing) and wrenched my knee.
"Q. What part of your leg?
"A. It was on this side, here.
"Q. How far from your ankle?
"A. Something between half way from my ankle, maybe up to 4 inches on my leg, there.
"Q. Where it hit you on the leg, did it skin it, make a bloody spot, anything?
"A. I suffered too much to pay any attention to it.
"Q. You didn't see any bruised part on you leg?
"A. No, sir.
"Q. You had your pants on?
"A. Yes, sir."

Lee Nelson and William Kingrey claim to have seen the accident. The former, asked if he was present when Daniel Stanley suffered an injury in the woods, said:

"Well, I suppose I was right there. I understand he says he was on a wagon, and I know I was on a cart."

He further stated:

"We pulled in on the skidway as I backed up the cart and the log slipped or rolled, and I heard him groan. I said, 'Look out

Uncle Buddy.' I get down and goes around and the old man was holding to his leg. That was about all there was to it. I asked him, are you hurt, and he said, a little bit, and that was all to it."

He testified that he knew that the log rolled, and that they were supposed to have a cant hook, that, after hearing plaintiff groan, he went around to him and asked him if he was hurt, and he said, "Yes," and was pressing his hand to his knee like he was hurt.

"Q. What did he do after that?
"A. I declare, I don't know. He worked right on so far as I was concerned the balance of the day."

Asked when it happened, he replied that he could not tell whether it was before noon or after noon; that his back was to the plaintiff, and he did not see the accident; that it seemed to him that he was on a cart, and as he backed up the log fell; that a cant hook is used in rolling logs on wagons, but not for the purpose of loading carts. It also seemed to him that they did some work after plaintiff said he had been hit by a log. The witness was very firm in his belief that he was driving a cart. It was Nelson's team that was being loaded, and, if he was driving a cart, the plaintiff and William Kingrey, who both say that plaintiff was injured while loading a wagon and using a cant hook, are discredited concerning a matter which is the foundation of plaintiff's case.

William Kingrey testifies that he was driving a wagon for defendant at the time, and saw the plaintiff get hurt; that plaintiff had a cant hook and was rolling a crooked log; that it rolled nearly over, the cant hook tore out, and let it roll back and hit his left leg. Plaintiff hollered when the log hit him, and Lee Nelson asked him:

"Are you hurt?" Plaintiff replied, "Yes, I believe I am hurt pretty bad," and that plaintiff has been complaining with it ever since. He also testified that it was between 4 and 5 o'clock in the evening; they were getting their last load. Plaintiff did not work after he got hit, but got on a wagon and went to the lot, there caught the train, and went into camp with them.

The witness Kingrey testified in open court on February 16, 1929. On February 19, 1929, he signed a statement prepared by the agent of an insurance company, which contains important facts inconsistent with his testimony given previously on the stand. Defendant urges this against the credibility of his testimony in open court. At the time of the trial Kingrey was only 21 years old, and testified that he could neither read nor write; that the statement was not read to him, and in signing it he thought he was signing the testimony he had given in open court.

F. J. Kent, witness for defendant, testified very straightforwardly that he himself read the statement to Mr. Kingrey before Kingrey signed it. But, in view of Kingrey's denial that the statement was not read to him, his declaration that he could not himself read it, and that he thought he was signing the statement he had given in open court, we have not given the statement any weight against his testimony.

Various facts and circumstances elicited during the examination of this witness in open court indicate, however, that he was very friendly to the plaintiff. He testified that he came in on the caboose with the plaintiff, occupied a seat two or three men from him, and that plaintiff complained within his hearing that his leg hurt pretty bad; that Mr. Berry, the woods foreman, and Mr. Nelson were both near

plaintiff in the caboose, and also heard what he said.

Mr. Berry testified that he saw plaintiff in the caboose, but that he did not hear him complain of having been injured.

Mr. Nelson also declared that plaintiff did not complain to him while on the caboose.

Plaintiff testified that he came in on the caboose from where he had been injured, a distance estimated by him at about 10 or 12 miles; that he knew nearly all of the men in the caboose. Asked if he was not in considerable pain when he was coming in, he replied, "Right smart, not till about the sun went down, my leg was perfectly numb," but that he did not remember complaining of his injury to anybody in the caboose.

If plaintiff had been suffering from a serious injury received as alleged, it would have been a natural impulse to speak of it to his friends and co-laborers. He testified that, after he got off the caboose, he was almost past going at all. But at the same time, so he claims, he got off the caboose, without help, on one foot, and hobbled along until he was picked up and carried home. After making this statement that he "hobbled along" until he was picked up and carried home, he was asked if he was not in great pain at the time he got off the caboose, and he replied, "In this knee when I was hurt, it was beginning to come to more feeling and was hurting me awful."

The evidence shows that Dr. Price, a physician in the employ of defendant, had an office within about 100 yards of the place where plaintiff left the caboose, and that this doctor had treated plaintiff for a knee trouble 3 or 4 years previously. But the plaintiff made no effort to see Dr. Price, and did not ask about him. If a log had rolled back against plaintiff's leg, say an hour or two before, bending it sideways at the knee, badly spraining the knee joint, tearing the ligaments and muscles in same, and pushing up the kneecap, as he alleged, and causing him severe pain, he would have felt moved to call on this physician, so close by, and solicit his help before going home. This voluntarily going away from an available physician without explanations, within, say, a couple of hours or sooner, after the alleged injury, is not what a man ordinarily would have done. The evidence shows that he got into an automobile with his brother, Dock Stanley, at the place where he left the caboose, and rode to Dock Stanley's, between a quarter and a half mile distant. The plaintiff lived about 300 yards beyond Dock Stanley's, but, when he got to Dock Stanley's house, he got out of the automobile and walked the 300 yards to his own home, unassisted.

John Stanley, a brother of the plaintiff, was at Luneta, the place where the caboose stopped. He says that he saw plaintiff when he came in and went out to where he was, and plaintiff told him that he got bumped with a log. The same evening, John Stanley says, he went to plaintiff's house; that plaintiff was sitting on the back porch holding his knee; that witness saw his knee; it looked to him a little swollen; he rubbed it in an effort to get it in place; that plaintiff was in misery at the time.

Dock Stanley, the other brother, was also at Luneta when plaintiff got off the caboose. He testified that he saw him standing with his hand like that on his left knee, and it called his attention. He went up to him and asked him what was the matter, and Daniel Stanley said, " 'I hit my

knee today on a log.' So I told him to get in my automobile and I took him to my house." He further testified that, after getting to his house, plaintiff voluntarily got out of the automobile and walked home unassisted, a distance of about 300 yards. He was then asked:

"Q. Why did you not take him home that day if he was crippled?
"A. I asked him if he wanted me to, and he said he thought he could make it. He went on hobbling home. I was willing to take him home."

That the next morning (Sunday) plaintiff's wife and boy came to his house to get his son to take plaintiff in Dock Stanley's automobile to see Dr. Price because he was suffering so bad. Dr. Price was not at home. The next day (Monday) he sent his son with his automobile to carry plaintiff to see Dr. Price again on account of his suffering with his knee.

Mrs. Stanley, plaintiff's wife, says that, when plaintiff left home that morning, he was as well as he ever was, and when he got home he told her he had been hit with a log, and his knee was hurting him very bad. He was holding it when he came in, showed her where it was swelling and where it had been mashed with a log. There was no blood nor bruises, just swelling where it was mashed; that his knee-cap slipped up where the log mashed it.

Dr. Price testifies that plaintiff came to see him Monday morning and told him that he had received a blow on the leg, something half way from his ankle, but that he was suffering with his knee. He found that an infusion had taken place in his kneecap, raising it up. Dr. Price was examined at length concerning plaintiff and his alleged injury, and also plaintiff's previous trouble with his right knee. He diagnosed his trouble on the present occasion as an infusion of a joint, a kind of infusion around the left knee joint, and gave it as his opinion that it was a rheumatic condition; that the condition of the joint did not, however, necessarily mean rheumatism.

This doctor testified that he saw no evidence of an injury, and did not think plaintiff could have received an injury that produced the infusion of the joint that existed in plaintiff's knee without leaving some sign on the leg. He thought the blow, where plaintiff said the log hit him on the ankle, if severe enough to produce infusion in the knee joint, would have left some external sign on the ankle.

The doctor testifies that he treated plaintiff for rheumatism a few years before, when plaintiff had a similar trouble involving his right ankle and right knee; that the trouble was caused by the condition of his system; that it was common for a man to recover from rheumatism and have it again in the same form; that infusion of the joint could have been caused by an injury, but that rheumatism was what usually caused infusion of the kind existing in plaintiff's leg. Required by the court to answer, he testified that about 4 years before he had treated plaintiff for a condition that usually caused infusion around the joint, and believed that condition, working in plaintiff's blood at the present time, was part of his trouble. The doctor was firm in his opinion that the infusion in plaintiff's knee was not the result of an injury, as claimed by plaintiff, and therefore refused plaintiff's request to put him on insurance.

Plaintiff admitted in his evidence that he had suffered with rheumatism in his right knee and hip some 3 or 4 years before, and had been treated for it by Dr. Price.

After plaintiff had been treated by Dr. Price, he consulted Dr. Martin, who had an X-ray picture made of his knee. Dr. Martin testifies that there was no fracture, but that he had an infusion in the joint, a fluid in the joint; that the kneecap was raised up, which, he stated, always existed in an infusion. Dr. Martin, basing his opinion on the history of the case as given him by plaintiff, says that the condition in plaintiff's knee was not due to rheumatism, but to an injury received as claimed by plaintiff. He said, however, that without plaintiff's history he would only say that plaintiff had an infusion in the joint, which might be due to injury, might be due to tuberculosis, to rheumatism, or to any infection.

Dr. Holcomb was asked:

"Q. Do you think, doctor, that if he (meaning the plaintiff) had such a lick there that would cause this infusion, that he would be able to walk?
"A. Well, there would have to be a good deal of injury and trauma of a knee joint to produce an infusion.
"Q. You think if enough to produce an infusion there would be likely some mark on the leg?
"A. Liable to be. The pain would in all probability be so intense a man could not get around, if there was enough to produce an infusion.
"Q. If there was enough trauma to produce infusion it would incapacitate a man in that knee?
"A. It would.
"Q. You do not think he could walk 2 or 3 hundred yards?
"A. Depends entirely on the amount of the trauma."

Subsequently asked if he thought it reasonable that a man could walk 300 yards after he got an injury sufficient to cause an infusion to his knee joint, he answered:

"No sir, it is not common."

Further questioned if he thought it reasonable and consistent with an injury to the knee sufficient to cause infusion, and he answered, "No, sir"; and gave similar answers to further questions along the same line.

Act 20 of 1914, sec. 38 (amended Act 38 of 1918), reads as follows:

"The word 'accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury.
"The terms 'Injury' and 'Personal Injuries' shall include only injuries * * * or infections as naturally result therefrom. The said terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."

The burden of proof is upon the plaintiff to show that the infusion in his knee was the natural result of the striking of his ankle by the log, as alleged in his petition, or that it so activated and aroused into virulence a dormant condition in his system, and that his present incapacity is a natural result of this activation.

The plaintiff testifies that he left the scene of his alleged injury almost immediately, boarded a caboose used to take the men home from their work at the end of the day. The distance was 10 or 12 miles. The caboose was full of workmen nearly all of whom he knew, one of them being his foreman. If he had suffered a hurt of any consequence, it would have been natural for him to have complained of it to his fellow workmen. Only one of them, Mr. Kingrey, heard plaintiff complain. The plaintiff, in fact, could not remember complaining to anybody on the train. When the caboose reached Luneta, if plaintiff had

been seriously hurt, he would ordinarily, upon getting out, have sought Dr. Price, an available physician. He was within 100 yards of Dr. Price's office. Dr. Price had 3 or 4 years before treated him for a similar trouble in his right knee; he was acquainted with Dr. Price; it would have been a natural wish to see him before going home. But he made no effort at all to see him. He got into an automobile with Dock Stanley, and rode in it to Dock Stanley's home; his own house being about 300 yards distant. Dock Stanley would have taken him home, and he testifies that he was willing to do so, but plaintiff voluntarily got out when he reached Dock Stanley's, declined his offer to take him home, and walked home, a distance of about 300 yards, unassisted.

Disease must be traceable as the natural result of an accident before it is compensable.

Plaintiff's actions speak louder than his words. They satisfy us that he had not received an accidental injury to his kneecap causing the infusion which was subsequently found to exist.

The opinion of the physician who had formerly treated him that the infusion was not the result of an injury, nor trauma, nor activated by a blow received on the ankle, but was the result of a dormant disease already existing in plaintiff's system, which had at the time developed to the point when infusion set in, is felt to be convincing.

The judgment appealed from is erroneous, contrary to the law and the evidence.

For these reasons, the judgment appealed from herein is now annulled, avoided, and set aside, and the judgment of the plaintiff is refused and rejected at his cost in both courts.

LECHE, J., not participating.

## ON REHEARING

LeBLANC, J. Further consideration of the facts in this case has prompted us to change our views, and we have concluded that our former judgment, 126 So. 579, 582, which reversed the judgment of the lower court in favor of the plaintiff, was in error.

The suit is one brought under the Workmen's Compensation Law (Act No. 20 of 1914, as amended) by the plaintiff, Daniel Stanley, against the defendant company by which he was employed as a member of its team gang, assisting in loading logs in the woods for transportation to its sawmill at Lunita in the parish of Calcasieu. He alleges that on July 14, 1928, while engaged in the act of rolling a log with a cant hook for the purpose of loading it, the latter tore loose from the log and the log rolled against his knee bending his leg sideways at the knee, badly spraining the kneejoint, tearing the ligaments and muscles in same and pushing the kneecap up.

The defense is a denial of any accidental injury and consequent disability and the further affirmative defense that, at the date of the alleged injury, plaintiff was suffering from chronic rheumatism, which condition was in no way affected by any occurrence for which the defendant is responsible.

It will be observed at the outset that the case is one dealing almost exclusively with questions of fact which were resolved by the trial court in favor of the plaintiff. Our former opinion goes into a detailed analysis of the facts to support the finding that the plaintiff "had not received an accidental injury to his kneecap causing the infusion which was subsequently found to exist."

On reconsideration, we find that the opinion attaches a bit too much of importance to details and uses this as argument to weaken the testimony of the plaintiff to the effect that he had been struck on the left leg by a rolling log which slipped from his cant hook, and that, on being so struck, he was injured. For instance, the opinion makes it appear that there is no certainty in plaintiff's testimony whether it was the last log they handled that afternoon or the next to the last; also some lack of certainty as to the hour at which it happened and whether they were using carts or wagons in hauling the logs that day. These are all minor matters which cannot affect his right to recover, if indeed he was injured. In other words, whether it was the last log or the second to the last that rolled and struck his leg, or whether it was 3 o'clock in the afternoon instead of 5, or whether it was a cart they were using and not wagons, makes no difference as far as his rights under this action are concerned, and, at most, the uncertainty as to these details can only affect the weight of his testimony and that of his witnesses.

Considered from that standpoint, what do we find? Plaintiff himself is a man well advanced in years, being, so we are informed, fifty-five years old. All of his working life of thirty-four years or more, he has worked for the defendant company, never for any one else. He is a married man and has raised a family on a rather meager wage. At the time he says he was injured, he was earning $2.25 a day. This, it appears, displays a record of constant and faithful employment which ordinarily would tend to recommend him as an honest man, and, as such, worthy of belief. The learned district judge was in better position than we are to judge of his credibility, and he must have believed him, since he rendered judgment in his favor.

He gives a plausible account of the way in which he claims to have been injured. He does not testify that the log struck him on the knee, but on the leg, and the question as to whether the blow on the lower part of the leg could have produced the resulting infusion in the kneecap is one which neither he nor any ordinary layman can assert with positiveness, and we have of necessity to rely on the testimony of the doctors if we are to reach any conclusion on that important point.

He answers the trial judge's question as to how the log happened to fall on him by saying: "I was holding it on the chain—rolling it on the ground, and it was crooked and the hook tore out and the log came back and struck my leg hard." It was a crooked log "and pretty hard to turn." He was not sure of the diameter of the log, but it measured probably 12 to 16 inches at the top. A log that size certainly could have struck him on that part of the leg where he says it did.

In support of this testimony, he offers one of his fellow employees, Leo Jolson, as a witness, who says that a log slipped and rolled and he heard plaintiff groan. He then continues:

"I said 'Look out Uncle Buddy.' I gets down and goes around and the old man was holding to his leg. * * * I asked him if he was hurt and he said a little bit * * *."

Another fellow worker, William Kingrey, was placed on the stand as a witness and swore that he saw the log hit the plaintiff. "When it rolled nearly over" he says, "the cant-hook tore out and the log rolled back and hit his leg." The record contains much that may be used in comment about this witness because of the fact that he is said to have given a statement to the representative of the insurance company which

indemnified the defendant which did not tally exactly with his testimony on the witness stand. A rather unusual situation is presented with regard to this purported statement. The insurance agent saw Kingrey at Lunita, where he lived, on the same day that he was supposed to be on his way to Leesville on another investigation. He made notes of what Kingrey told him and then said that he would put the statement in typewritten form and have him to sign it. Kingrey says that he waited for him until late that afternoon and that the agent did come back to Lunita, but never asked him to sign anything. Kingrey, being out of employment at the time, left to go to Texas and never heard any more about the matter until he was sought as a witness in the case by both the plaintiff and the defendant. It is shown that the agent of the insurance company, on his return to his office in Beaumont, Tex., dictated a statement to his stenographer from the notes he says he had made, and mailed the typewritten form to Mr. Kent, bookkeeper for the defendant company, to have it signed. Kingrey had in the meantime left Lunita, and his signature was never obtained. It appears rather singular that it was necessary for this agent to go back to his office in Beaumont to reduce this statement to typewritten form, and strange also that he should have destroyed the original notes from which it was dictated before it had been signed by the party who was to subscribe to it. Another odd happening is that, after Kingrey had testified for the record and his evidence taken down by a stenographer, he is taken to the office of the defendant company and there made to sign the alleged original statement he was to have given out. Even then, the statement is attested by the signature of a witness who admits that he did not see Kingrey sign it. We learn from the record that Kingrey is an illiterate young man, about twenty-one years old, who barely knows how to sign his name, and he tells the court on examination afterwards that, at the time he signed the statement, it was not read to him, and that he signed it believing that it was the report of what he had testified to on the witness stand. All of this impresses us as being an effort on the part of the insurance company to discredit the testimony of this uneducated young man. It may be true that, as a witness, he appears friendly to the plaintiff, but not the extent that it can be concluded that he has deliberately perjured himself.

Certain facts and circumstances following within an hour or so the moment he claims to have been injured corroborate the testimony of the plaintiff and his witnesses. He left the woods to return to his home on the caboose, suffering, as he says, intense pain. The original opinion correctly states that he did not complain to any one on the caboose, and that he walked three hundred yards from the home of his brother to his house. It is then inferred that the natural impulse would have been for him to complain and ask to be taken all the way home. But all people do not accept and endure pain and suffering in the same manner. Some are given to complain for the smallest kind of injury or ache and others go on with severe pain not saying a word. It would be reasonable to assume that a man, accustomed to hard work and labor as was this plaintiff, could endure pain and suffering far more easily than one who works in an office not doing manual labor and not accustomed to physical outdoor exercise. The fact is that plaintiff did complain to his brother Dock Stanley on leaving the caboose, and that, instead of walking, he hob-

bled along. He told his brother also that he had been hit on the leg by a rolling log. He also told his brother John after he arrived home, as he did also his wife, that he had been injured and how he was undergoing the suffering which was increasing all the while. They both tell about the inflammation they saw about the knee-joint. He suffered all that night, and early the next morning asked to be taken to the doctor.

Plaintiff had not had any trouble of any kind for perhaps three years previous when he had had an attack of rheumatism in the right hip and leg. He was a strong, healthy man the time preceding the alleged accident, and had not felt an ache or a pain until the moment when that log rolled and struck him on the leg, all of which, with his testimony and that of the witnesses he has produced, satisfactorily establishes the fact, in our opinion, that he was injured, as he says he was.

The next important question now arises: Was the infusion in the kneecap the result of the injury?

The defense is that the plaintiff's trouble was not of traumatic origin, but came from a rheumatic condition existing in his body, and, in support thereof, defendant tendered the testimony of their regularly employed physician, Dr. Price. This doctor had treated the plaintiff when he suffered from the attack of rheumatism previously referred to, and it would be the natural thing for him to think of, as a physician, that that was the predisposing cause of his present ailment. He seems to lay great stress, in reaching the conclusion that there was no trauma, on the fact that there were no external signs of injury. On this point, however, the two other doctors who testified in the case do not agree with him.

One of them, Dr. Holcomb, placed on the stand as an expert witness by the defendant, says, in answer to a hypothetical question in regard to plaintiff's condition relative to being well in the morning and working all day, and then suffering this acute pain and having the swelling in the knee, that it is not logical to think that it could have existed, as Dr. Price says, from rheumatism. Dr. Martin, plaintiff's witness who examined him after he was injured and who was in court during the time plaintiff testified as to how he was injured and how he suffered, positively asserts: "I do not think that condition is due to rheumatism," and assigns a reason, by adding further: "We have the history of the case and the infusion is confined to one joint." This last doctor seems to us to have been very much confirmed in his opinion that the plaintiff's condition was due to the injury he gave a history of having received.

Thus it appears that on this question of fact also the evidence is in favor of the plaintiff which entitled him to the judgment rendered in his favor in the lower court. It may be that in our first consideration of this case, we did not give sufficient attention and weight to the reasons assigned by the learned district judge in support of his judgment. Our review of the facts certainly justifies the conclusion that there was no manifest error in his finding, and we now are of the opinion that it should have been affirmed instead of reversed.

For the foregoing reasons, it is now ordered that the former opinion, judgment, and decree of this court in favor of the defendant, which dismissed the plaintiff's suit, be now set aside, avoided, and reversed, and it is further ordered, adjudged, and decreed that the judgment of the lower

638

court in favor of the plaintiff be, and the same is hereby, reinstated and affirmed.

ELLIOTT, J. (dissenting). The facts of this case are truly stated in the original opinion. The opinion on rehearing does not apparently take into account a fact, mentioned in the original opinion, that when the plaintiff and others in the car with him reached Lunita, they all got out and went to their respective homes, say an hour or two after the receipt of the alleged injury. The plaintiff was then within say 100 yards of the office of Dr. Price, the company physician. This physician, had treated plaintiff previously, and plaintiff knew where he kept his office. Plaintiff manifested no desire and made no effort to speak to this physician when he got out of the car. It would have been a natural thing for him to do so, at the earliest opportunity, if he had been seriously injured and was suffering therefrom as claimed, not only for the purpose of getting treatment, but to inform him of his incapacity and get placed on insurance during the period of his disability. He went to see him the next morning. The former opinion mentions and quotes Act No. 20 of 1914, sec. 38 (amended by Act No. 38 of 1918, p. 60); but overlooked to mention the further statute, section 18, subsection 4 (amended by Act No. 85 of 1926, p. 122), which provides:

"All compensation payments * * * shall mean and be defined to be for injuries and only such injuries as are proven by competent evidence, of which there are or have been objective conditions of symptoms proven, not within the physical or mental control of the injured employee himself."

I think the original opinion of this court herein correct, and dissent from that on rehearing for the reasons stated in the first opinion.